**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 1:22-cr-713-PAB-1** |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **PATRICK O'MEARA, JR.,** | |
| | **MEMORANDUM OPINION AND** |
| **Defendant.** | **ORDER** |

This case is before the Court on Defendant Patrick O'Meara, Jr.'s ("O'Meara") Motion to Suppress, filed on February 17, 2023. (Doc. No. 19.) On March 14, 2023, the United States of America ("the Government") filed a Response in Opposition. (Doc. No 23.) And on March 21, 2023, O'Meara filed a Reply. (Doc. No. 24.)

For the following reasons, the Court denies O'Meara's Motion to Suppress.

**I.      Procedural History**

On November 21, 2022, the Government filed a Criminal Complaint against O'Meara for a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (Doc. No. 1.)  The Complaint stemmed from the seizure of four kilograms of cocaine inside a brown duffel bag in the trunk of O'Meara's car. (*Id*.)  On December 15, 2022, a grand jury charged O'Meara with three Counts: (Count 1) Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); (Count 2) Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); and (Count 3) Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). (Doc. No. 10).

On March 19, 2023, O'Meara filed the present Motion to Suppress. (Doc. No. 19.) He seeks to suppress the cocaine found in his car as well as the cocaine and firearms later seized from

his house and two storage units. (*Id*.) O'Meara requested an evidentiary hearing on his Motion. (*Id*.) On March 14, 2023, the Government filed an Opposition. (Doc. No. 23.) On March 21, 2023, O'Meara filed a Reply. (Doc. No. 24.)

On May 17, 2023, the Court held an evidentiary hearing on O'Meara's Motion. Sergeant Brian McGill[1] ("Sgt. McGill") and Drug Enforcement Administration ("DEA") Special Agent Stephen Chokshi[2] ("SA Chokshi") testified at the hearing. (*See* Hearing Tr. (Doc. No. 26).) Additionally, the Court admitted into evidence Sgt. McGill's body camera footage (Government Exhibit 1 ("Body Cam")), video footage of the right rear seat of Sgt. McGill's patrol vehicle (Government Exhibit 2), and law enforcement reports. (Defense Exhibits A through E.) In lieu of closing arguments, the parties agreed to submit supplemental briefings by June 16, 2023. On June 16, 2023, O'Meara filed a Supplement to his Motion (Doc. No. 29), and the Government filed a Supplement to its Response. (Doc. No. 28.)

## II. Factual Background

On November 18, 2022, Sgt. McGill received a call from an unidentified DEA agent[3] about O'Meara. (Hearing Tr. at p. 7.) The details of the phone call between Sgt. McGill and the DEA agent are vague; but, at the very least, the DEA agent gave Sgt. McGill O'Meara's name and described what he looked like (*id*. at p. 75), told Sgt. McGill that O'Meara was driving a white Chevy Impala (*id*. at p. 33), and notified Sgt. McGill that O'Meara had in his car a brown bag possibly containing cocaine. (*Id*. at p. 76.)

---

[1] Sgt. McGill works for the Ohio Department of Public Safety on the Criminal Patrol Team based out of the Warren County District Headquarters. (Hearing Tr. at p. 5.) He has been with the Department of Public Safety for 13 years. (*Id*.) For ten of those years, he has been assigned to the Criminal Patrol Team conducting drug interdiction. (*Id*.)
[2] SA Chokshi has worked for the Drug Enforcement Administration for 14 years. (*Id*. at p. 61.) He has conducted 50 to 100 arrests and up to 40 stops during that time. (*Id*. at pp. 61, 68.) SA Chokshi was the acting supervisor for the investigation of O'Meara. (*Id*. at 71.)
[3] At one point during the hearing, Sgt. McGill referred to the agent as "Luis" (*id*. at p. 10), but SA Chokshi did not identify the agent who called Sgt. McGill.

At 11:52 a.m. on November 18, 2022, Sgt. McGill spotted O'Meara's white Impala on Interstate 80 and observed that he was following the cars in front of him too closely. (*Id*. at pp. 10, 12.) Sgt. McGill stopped O'Meara and approached his car from the passenger side. (Body Cam at 01:40.) He advised O'Meara that he pulled him over for following two different cars too closely. (*Id*. at. 01:55.) Sgt. McGill asked O'Meara how much space he thought he had left between him and the car in front of him. (*Id*. at 02:04.) O'Meara responded one car length. (*Id*. at 02:08.) Sgt. McGill testified that a driver "should have a car space for every 10 miles [per] hour" the driver is traveling, and the speed limit on Interstate 80 is 70 miles per hour. (Hearing Tr. at p. 12.)

Sgt. McGill then asked O'Meara for his license, which O'Meara gave him. (*Id*. at 02:24.) Sgt. McGill next asked O'Meara where he was headed. (*Id*. at 02:35.) After some delay, O'Meara said he was driving to a friend's house. (Hearing Tr. at p. 14.) Sgt. McGill also asked O'Meara for his registration which, again, O'Meara promptly provided. (Body Cam at 02:50, 3:02.) At this point, Sgt. McGill told O'Meara he did not plan on issuing him a ticket, but Sgt. McGill asked O'Meara to exit the car while he went over his driving record. (*Id*. at 03:08.) After patting O'Meara down, Sgt. McGill brought O'Meara to his patrol car and had him sit in the right back seat. (*Id*. at 04:10.) Sgt. McGill testified that O'Meara's answer to where he was going was "a bit strange," and that throughout this initial interaction, O'Meara appeared "over nervous," made "very little eye contact," his belly was "moving in an out," and he had "increased respiration." (Hearing Tr. at pp. 11, 14.)

Once back in his patrol car, Sgt. McGill radioed his dispatch with O'Meara's driver's license number to check if it was valid and if he had any wants or warrants. (*Id*. at p. 15.) Because of what the DEA agent had previously told him, Sgt. McGill also requested O'Meara's criminal

3

history. (*Id*. at 16.) During this same radio call, Sgt. McGill requested that a K9 unit come to the scene. (*Id*. at 15.)

Sgt. McGill then began filling out O'Meara's traffic warning. (Body Cam at 05:26; *see also* Hearing Tr. at p. 16.) Sgt. McGill tried logging into the laptop in his patrol car but was unable to. (*Id*. at 17.) He testified he needed his computer to fill out the traffic warning with the location, time, and information about the driver and the car. (*Id*.) After several unsuccessful tries logging in, Sgt. McGill began to complete the traffic warning without access to his computer. (*Id*. at 07:54.) He ultimately was able to log in and completed the traffic warning at approximately 12:02 p.m. (*Id*. at 08:43.) While he had yet to hear back from the dispatch about O'Meara's criminal history, Sgt. McGill testified that he did not need it to complete the warning. (Hearing Tr. at p. 18.)

At nearly 12:04 p.m., the K9 unit arrived on scene and Sgt. McGill exited his patrol car to greet them with O'Meara's warning still in his hand. (Body Cam at 11:01.) Sgt. McGill then returned to his patrol car. (*Id*. at 11:10.) About a minute later, the dog detected drugs in O'Meara's car. (*Id*. at 12:28.) Sgt. McGill advised O'Meara of his *Miranda* rights and asked him questions. (*Id*. at 12:37.) O'Meara denied having drugs in the car and denied Sgt. McGill's request for consent to search the car. (*Id*. at 13:05.) At approximately 12:07 p.m., Sgt. McGill and another officer on scene began to search O'Meara's car. (*Id*. at 14:22.) Three minutes later, the other officer grabbed, opened, and began to search a brown bag from O'Meara's trunk. (*Id*. at 17:25.) Shortly thereafter, the officer told Sgt. McGill that he found suspected drugs in the bag. (*Id*. at 17:48.)

After finding the drugs in O'Meara's car, DEA agents applied for and received federal search warrants for O'Meara's house and two storage units. (Hearing Tr. at 70.)

**III.    Law and Analysis**

O'Meara does not argue that Sgt. McGill lacked probable cause to pull him over. Sgt. McGill testified that he observed O'Meara following the car in front of him too closely, and O'Meara admitted that he had left only one car-length between vehicles. (Body Cam at 02:08.) Sgt. McGill therefore had probable cause to believe O'Meara committed a traffic violation. *See United States v. Bonilla*, 357 F. App'x 693, 695 (6th Cir. 2009) (officer who witnessed defendant following one car-length behind another car and then a tractor-trailer all while traveling 60 miles per hour had probable cause to believe the defendant violated Ohio Revised Code § 4511.34(A) for following too closely).

Instead, O'Meara argues that law enforcement "prolong[ed] [O'Meara's] traffic stop," and "continu[ed] to detain him after completing the traffic stop, without reasonable articulable suspicion" in violation of the Fourth Amendment.[4] (Doc. No. 19 at p. 5.) Specifically, O'Meara contends that "the dog sniff was an unreasonable extension of the traffic stop." (*Id.*)

The Government responds that "the traffic stop was not unreasonably extended because the actions Sgt. McGill took were reasonably related to the stop and the canine alert occurred during the stop." (Doc. No. 23 at p. 17.) Specifically, the Government contends that the traffic stop was not over when the dog alerted to drugs in O'Meara's car because "Sgt. McGill had not yet received a confirmation from dispatch regarding O'Meara's criminal history." (*Id.*)

The Court must therefore first determine when the traffic stop ended.

---

[4] In his Motion, O'Meara also argued that Sgt. McGill "unreasonably prolonged the traffic stop" because he "took the time to respond to personal text messages." (Doc. No. 19 at p. 9.) However, at the hearing, Sgt. McGill testified that he was texting the K9 unit to provide them his location and ask for their estimated time of arrival. (Hearing Tr. at pp. 19, 50-51, 54.) O'Meara abandoned this argument in the Supplement to his Motion. (Doc. No. 29.)

A. **The Traffic Stop's Duration**

The "tolerable duration" of a traffic stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. An "officer's mission" includes not only "determining whether to issue a traffic ticket" but also "includes ordinary inquiries incident to [the traffic] stop." *Id*. (citation omitted). These inquires "[t]ypically . . . involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 355. An officer may also call a drug dog to sniff a stopped car "as long as it does not 'improperly extend the length of the stop.'" *Hernandez v. Boles*, 949 F.3d 251, 254 (quoting *United States v. Bell*, 555 F.3d 535, 542). Any extension of the traffic stop "must be grounded in independent reasonable suspicion." *United States v. Williams*, 68 F.4th 304, 309 (6th Cir. 2023) (citing *Hernandez*, 949 F.3d at 256). "This is a bright-line rule." *Hernandez*, 949 F.3d at 256 (citing *Rodriguez*, 575 U.S. at 355).

Sgt. McGill testified that after bringing O'Meara back to his patrol vehicle, he radioed his dispatch and requested both O'Meara's criminal history and that a K9 unit come to the scene. (*Id*. at pp. 15, 16.) He then began filling out O'Meara's traffic warning. (Body Cam at 05:26; *see also* Hearing Tr. at p. 16.) After resolving some computer issues, he completed the traffic warning at approximately 12:02 p.m. (Body Cam at 08:43.) At that time, he had yet to hear back from his dispatch about O'Meara's criminal history. But Sgt. McGill testified that he did not need it to

6

complete the traffic warning.[5] (Hearing Tr. at pp. 17-18.) The Court thus finds that as of 12:02 p.m. the traffic stop ended.

The K9 unit arrived two minutes later, and the dog detected drugs in O'Meara's car at approximately 12:05 p.m. (Body Cam at 12:16.) As previously noted, "any extension of a traffic stop absent independent reasonable suspicion is improper." *Hernandez*, 949 F.3d. at 256 (citing *Rodriguez*, 575 U.S. at 357). As such, to bridge the gap between 12:02 p.m.—when he finished the warning and the traffic stop ended—and 12:05 p.m.—when the drug dog alerted—Sgt. McGill needed independent reasonable suspicion of criminal activity. *See Williams*, 68 F.4th at 308.

The Government argues that Sgt. McGill's observation of O'Meara as "over nervous" provided Sgt. McGill not only reasonable suspicion but probable cause to search O'Meara's car. (Doc. No. 28 at p. 2.) O'Meara counters that "nervousness is not enough to justify a reasonable articulable suspicion of criminal activity." (Doc. No. 29 at p. 11.) O'Meara is partially correct. "[A]n officer who *only* observes a driver's nervousness [cannot] reasonably suspect that driver of drug crimes." *United States v. Bost*, 606 F. App'x 821, 826 (6th Cir. 2015) (citing *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008)) (emphasis added). Stated differently, "overly nervous behavior, although less probative and thus less relevant, may also contribute to a reasonable suspicion." *United States v. Ledbetter*, 929 F.3d 338, 347 (6th Cir. 2019) (first citing *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2012) and then citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

---

[5] After further questioning, Sgt. McGill testified that once he completed writing the traffic warning, he was "still waiting for dispatch for criminal history as part of the investigation." (Hearing Tr. at p. 20.) On cross-examination, he clarified that he "was waiting on returning the criminal history and then the K9 deployment to confirm or dispel [his] belief of drug activity." (*Id*. at p. 43.) The Court finds his response to be that he did *not* need O'Meara's criminal history to complete the traffic warning—as he first testified—but that he wanted it for what he believed had at that point become a drug investigation.

So, Sgt. McGill needed something more than O'Meara's nervousness to have reasonable suspicion that O'Meara was committing drug crimes. Reasonable suspicion is a low bar. *Williams*, 68 F.4th at 308. It "requires only that the officer have a 'moderate chance' of finding evidence of illegality on further investigation." *Id*. (citing *United States v. McCallister*, 39 F.4th 368, 373-74 (6th Cir. 2022)). "In assessing whether reasonable suspicion existed, [the court] take[s] the facts together, giving due weight to the officer's experience and specialized training." *Id.* (citation and internal quotation marks omitted).

Sgt. McGill observed that O'Meara was nervous and that he was slow to answer where he was going. (Hearing Tr. at pp. 11, 14.) In his experience, Sgt. McGill found O'Meara's conduct to be "a bit strange . . . unusual." (*Id*. at 14.) What is key, though, is that Sgt. McGill was not observing O'Meara in a vacuum. Though the Government does not emphasize this point in any of its briefings, before even stopping O'Meara, Sgt. McGill had reason to believe that O'Meara was trafficking drugs. Based on the DEA agent's call, Sgt. McGill knew O'Meara's name, what he looked like, what make, model and color of car he was driving, where he was going and when, and, most importantly, that he was carrying a brown duffel bag in his trunk containing suspected cocaine. (Hearing Tr. at pp. 7, 33, 75, 76.)

That knowledge together with O'Meara's nervousness and delayed responses created sufficient reasonable suspicion for Sgt. McGill to prolong the traffic stop until the drug dog alerted. *See United States v. Chandler*, 2022 U.S. App. LEXIS 33297 at *9 (6th Cir. Nov. 30, 2022) (individual's tip to officers about defendant's specific travel dates and locations gave officers reasonable suspicion to stop defendant's vehicle).

B. **O'Meara's Detention in the Patrol Vehicle**

Shortly after pulling O'Meara over, Sgt. McGill ordered O'Meara to exit his car. (Body Cam at 03:08). Sgt. McGill then walked him to his patrol vehicle and placed O'Meara in the back seat. (*Id*. at 04:10). O'Meara argues that Sgt. McGill "arrested [O'Meara] for the purposes of the Fourth Amendment when he locked him in the back of the police car." (Doc. No. 29 at p. 12.) However, "merely placing an individual in a police car does not automatically transform a *Terry* stop into a formal arrest." *United States v. Wright*, 220 F. App'x 417, 420 (6th Cir. 2007) (citing *United States v. Bradshaw*, 102 F.3d 204, 211-12 (6th Cir. 1996)); *see also United States v. Rogers*, 861 F. App'x 8, 14 (6th Cir. 2021) (placing suspected robbers in the back of police car did not elevate stop to an arrest); *Bradshaw*, 102 F.3d at 212 (holding officer could lawfully detain defendant until officer finished traffic stop).

But O'Meara also argues that "even if [this Court] finds that [Sgt.] McGill was still conducting a traffic stop when he put [O'Meara] in the back of the police car, such detention became illegal . . . when [Sgt.] McGill completed the purpose of the traffic stop." (Doc. No. 29 at p. 13.) As the Court previously concluded, Sgt. McGill had reasonable suspicion to prolong the traffic stop. Therefore, Sgt. McGill's continued detention of O'Meara must have been "temporary" and could "last no longer than is necessary to effectuate the purpose of the stop." *United States v. Mendoza-Ricardo*, 815 F. App'x 970, 976 (6th Cir. 2020) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). This means that Sgt. McGill must have "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly, during which time it was necessary to detain the defendant." *Id*. (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

9

That is exactly what Sgt. McGill did. Less than two minutes elapsed between the time the traffic stop ended and the time the K9 unit arrived at the scene. (Body Cam at 08:43 to 11:01). About a minute later, the dog alerted to drugs in O'Meara's car. (*Id*. at 12:28). The Court therefore finds that Sgt. McGill acted diligently to confirm his suspicion, and thus his detention of O'Meara did not violate the Fourth Amendment. *See id.* (upholding fifteen-minute detention to allow federal agents to arrive and question defendants); *see also United States v. Perez*, 440 F.3d. 363, 367-69, 372-73 (6th Cir. 2006) (upholding one hour detention for drug-sniffing dog to arrive); *United States v. Davis*, 430 F.3d 345, 354-55 (6th Cir. 2005) (same but thirty-minute detention).

C. **The Search, Seizure, and Fruits of the Poisonous Tree**

O'Meara argues that "[l]aw enforcement exploited the unlawful search of [O'Meara's] vehicle and the resulting primary evidence to obtain search warrants for three locations. . . . [A]ny and all evidence found subsequent to the execution of these search warrants must be suppressed as the fruit of the poisonous tree." (Doc. No. 19 at p. 12.) The Court found above that Sgt. McGill had reasonable suspicion to prolong O'Meara's traffic stop. And O'Meara does not challenge that the drug-sniffing dog's positive alert gave Sgt. McGill and the other officer on scene probable cause to search O'Meara's car. A drug dog's alert can by itself establish probable cause for a search. *Williams*, 68 F.4th at 311 (citing *United States v. Whitley*, 34 F.4th 522, 535 (6th Cir. 2022)). Therefore, the drugs and guns that law enforcement later seized—pursuant to search warrants obtained based on the traffic stop—were not fruit of the poisonous tree. *See United States v. Tinsley*, 2023 U.S. App. LEXIS 245 at *13 (6th Cir. Jan. 4, 2023).

D. **The Collective Knowledge Doctrine**

In a footnote in its Response, the Government argues that even if Sgt. McGill prolonged the traffic stop, "Sgt. McGill had probable cause before the stop occurred under the collective

10

knowledge doctrine." (Doc. No. 23 at n. 6.) O'Meara devotes most of the Supplement to his Motion to refuting this argument. (Doc. No. 29 pp. 3-9.) He argues that the Government "attempted to readopt the doctrine as its main argument during the Suppression Hearing." (*Id*. at p. 3.) He contends that the doctrine does not apply because the "stop was not a joint operation" (*id*. at p. 4) and because the DEA "did *not* request [Sgt.] McGill to stop [O'Meara] and search his car." (*Id*. at p. 8.) The Government does not address the collective knowledge doctrine in the Supplement to its Response. (Doc. No. 28.)

> The Sixth Circuit has explained the collective knowledge doctrine as follows:
>
> Under [the collective knowledge] doctrine, "an officer may conduct a stop based on information obtained by fellow officers" rather than information the detaining officer herself possesses. *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012). This doctrine applies "whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion," since in that case, the responding officer is effectively acting as the other officer's agent. *Id*. at 766; *see also id*. at 767 (outlining the scope of this doctrine).

*Mendoza-Ricardo*, 815 F. App'x at 976.

The Court does not construe the evidence adduced at the evidentiary hearing to amount to the Government "readopt[ing] the [collective knowledge] doctrine as its main argument." (Doc. No. 29 at p. 3.) And even if it did, the Court agrees with O'Meara that the doctrine is inapplicable to this case. SA Chokshi testified that the DEA did not direct or mandate that Sgt. McGill stop O'Meara's car regardless of whether he committed any traffic violations." (Hearing Tr. at pp. 77-78.) Rather, SA Chokshi testified that the DEA allows officers like Sgt. McGill to use their own experience, training, and authority to initiate the traffic stop. (*Id*. at pp. 79-80.)

This does not change the Court's above analysis, however. As explained, even without the collective knowledge doctrine, Sgt. McGill still had probable cause to pull O'Meara over, reasonable suspicion to prolong the traffic stop, and probable cause to search O'Meara's car.

## IV. Conclusion

For the reasons set forth above, the Court denies O'Meara's Motion to Suppress.

**IT IS SO ORDERED.**

                                              *s/Pamela A. Barker*
                                              PAMELA A. BARKER
Date: June 28, 2023                            U. S. DISTRICT JUDGE